Shahla V. MOUSAVI, M.D., Plaintiff,

v.

BEEBE HOSPITAL OF SUSSEX COUNTY, INC., a Delaware corporation, Defendant.

Civ. A. No. 86–129–CMW.

United States District Court, D. Delaware.

Nov. 12, 1987.

---

**5.** *See Magid,* 517 F.Supp. 1131 n. 5.

Joseph M. Bernstein, Wilmington, Del., for plaintiff.

Mason E. Turner, Jr. of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

### BACKGROUND

This action was brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1986). The plaintiff is Shahla V. Mousavi, M.D. ("Dr. Mousavi"), a female naturalized citizen of the United States. Dr. Mousavi is a physician specializing in neurology. The defendant is Beebe Hospital of Sussex County, Inc. ("Beebe" or "the Hospital").

The factual predicate to this case began in August of 1984, when Dr. Mousavi and her husband, also a physician, moved from Essex County, New Jersey, to Seaford, Delaware, to establish medical practices there. PTO 3 at III(4).[1] Also in late 1984, Beebe Hospital, located about 30 miles from Seaford, in Lewes, Delaware, began to recruit a neurologist willing to commit him or herself full-time to Beebe. Tr. A–14, 38, 42, 74. Beebe's efforts in this regard were by word-of-mouth and advertisements in medical journals. In Dr. Mousavi's case, one Dr. Saberi, a fellow Iranian with whom Dr. Mousavi and her husband had become acquainted in 1980, Tr. A–6, 172, established contacts with Dr. Mousavi on behalf of the Hospital, Tr. A–9, 47, and continued to try to persuade her to come to Beebe. Tr. A–22–23.[2] However, while it is clear that an opportunity of association with Beebe was held out to Mousavi, she apparently

did not perceive that association as involving a full-time commitment to Beebe, at least not initially. PX–2 (application for courtesy staff privileges); Tr. A–182, 185, B–33.

Dr. Mousavi's practice in Seaford was, at that time, fairly slow. Tr. A–174–75. In response to Dr. Saleri's encouragement, Dr. Mousavi applied to Beebe on December 5, 1984, for courtesy staff privileges. Such privileges would allow her to admit patients and do consultations, but carried no requirements such as attendance at meetings or emergency availability. PX–2; PX–21 at 4 (Hospital By–Laws). She was granted temporary privileges on December 11, 1984, and began seeing patients at Beebe. PX–3; PX–22. On January 24, 1985, she wrote Beebe to request that her application for courtesy staff be changed to an application for active staff. PX–5.

During this period, Beebe continued its search for a full-time neurologist. On January 28, 1985, Dr. Jonathan Hall responded to one of the advertisements for the neurologist position, Tr. A–123–24, and subsequently came to Lewes from St. Louis, Missouri, where he was completing his neurology residency. DX–3. Dr. Hall visited and made several telephone calls to Beebe specifically relating to the position, Tr. A–64, 101–02, and he expressed concerns about his ability to maintain a successful neurology practice in Lewes, given the small size of the area. Tr. A–125–27. He inquired about financial assistance from Beebe, including a minimum income guarantee for the first year. Tr. A–128–30.

On February 13, 1985, the Staff Development Committee[3] received, through Dr.

---

1. The following abbreviations will be used in this Opinion when documents relating to the case are cited:
   PTO—Pre–Trial Order (Docket Item 25)
   PX–____—Plaintiff's Exhibit No. ____
   DX–____—Defendant's Exhibit No. ____
   Tr.—Trial Transcript
   Cook Tr.—Transcript of Testimony of Gilbert Cook (Docket Item 30)

2. The Hospital's need for a neurologist was also discussed with Dr. Mousavi by Dr. Khorfan, then Chief of Medicine, Mr. Cook, then Hospital Administrator, and Mr. Monihan, then Assistant Administrator. It appears from the record that

none of the discussions with Dr. Mousavi was formal in nature. *See, e.g.,* Tr. A–47–48.

3. As far as the Court can ascertain, the procedure for hiring a member of the medical staff at Beebe was as follows. A request would be initiated by the particular department involved—here, the Medical Service—and approved by the Board of Directors. Tr. A–75. The recruiting effort was coordinated and administered by Hospital Administration. Tr. A–76–77. Administration screened potential candidates and set up meetings with administrators and members of the medical staff. Tr. A–76. The Staff Development Committee, which included medical

Khorfan, Chief of Medicine, the Medical Service's recommendation of Dr. Hall for the neurologist position. DX–4. Dr. Hall, upon being offered the position, renewed his financial concerns, and Beebe orally agreed to undertake certain financial assurance measures for him. Tr. A–129–31. On March 24, 1985, Dr. Hall confirmed in writing the financial arrangements and his acceptance of the position, based upon those arrangements. DX–5.

While negotiations with Dr. Hall were taking place, Dr. Mousavi contacted various individuals at Beebe several times, requesting that action be taken on her application for active staff privileges. PX–8; PX–9. The Hospital did not respond, Tr. A–196, and in a letter dated April 19, 1985, Dr. Mousavi threatened to take legal action if she did not receive an answer within two weeks. PX–9; Tr. A–197–98.

Beebe's response consisted of a letter informing Dr. Mousavi that Dr. Hall had been chosen to fill the neurologist position. The letter referred to Dr. Mousavi as a "candidate" for that position. PX–10. Dr. Mousavi then wrote Beebe to inquire whether the appointment of Dr. Hall amounted to a denial of her application for active staff privileges. PX–11. Again, Beebe did not reply.

At this point, Dr. Mousavi hired an attorney to pursue the matter with the Hospital. Her attorney wrote to the Hospital on May 10, 1985, reiterating Dr. Mousavi's concerns that Dr. Hall's selection constituted a denial of her application. PX–12. Also on May 10, Dr. Mousavi's application was referred back to the Credentials Committee, which had earlier approved her for courtesy staff privileges. DX–9. The Medical Executive Committee gave Dr. Mousavi active staff privileges on June 14, 1985. DX–9.

However, the Hospital's letter to Dr. Mousavi informing her of her active staff privileges also indicated that Dr. Hall's relationship with Beebe was in the nature of an exclusive agreement. PX–13.[4] The effect of this agreement was to decrease drastically the number of Dr. Mousavi's consultations at Beebe subsequent to July 1, 1985, when Dr. Hall began at Beebe. Tr. A–141–43, A–206–07; PX–22. There was a substantial decline in her private practice, and in April of 1986, Dr. Mousavi closed her Lewes office. Tr. B–9.

The gist of Dr. Mousavi's complaint under Title VII is that Beebe's treatment of her, culminating in its contract with Dr. Hall, was a result of discrimination against her on account of her sex, and thus impermissibly deprived her of an equal employment opportunity and interferred with her employment opportunities beyond the Hospital. The case was tried to the Court on June 10 and 11, 1987. This Opinion constitutes the Court's findings of facts and conclusions of law in accordance with Fed.R. Civ.P. 52(a).

## DISCUSSION

### A. *Standing*

■ At the threshold of this case, the Court must determine whether Mousavi has standing to sue under Title VII. While it is clear that Beebe is an employer within the meaning of Title VII,[5] it is not equally clear how to define Beebe's potential rela-

---

and non-medical staff members, was responsible for recommending a candidate for a position. Tr. A–79. That committee, however, deferred to any recommendation made by the Chief of Medicine. Tr. A–79–80. When a recommendation was made by the Staff Development Committee, the full application would be reviewed by the Credentials Committee. Tr. A–33. It would then pass to the Medical Executive Committee and to the Board of Directors for final approval. Tr. A–33–34. However, the participants in this recruitment and approval process were generally somewhat confused as to the specific requirements and steps in the internal procedure, undoubtedly due to the lack of formality or precision with which the procedure was observed.

4. The letter stated:
   My belief is that you are aware that Beebe Hospital has an exclusive understanding with Dr. Jonathan Hall for neurology work at the hospital. This provisional appointment does not affect that arrangement. Beebe Hospital will require that all neurological evaluations be made by him.

5. 42 U.S.C. § 2000e(b) defines an employer as one who employs 15 or more employees, with other qualifications and restrictions. *See* PTO 3 at III(3).

tionship with Mousavi. Title VII states at 42 U.S.C. § 2000e–2(a)(1):

> It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

The words of this subsection and caselaw interpreting it indicate that a person need not be a common-law employee to maintain a suit under Title VII. *See, e.g., Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338, 1341 (D.C.Cir.1973) (there is no indication in Title VII that "any individual" should be read to mean only an employee of an employer). Moreover, the provisions in Title VII relating to the private right of action use the phrase "person aggrieved". 42 U.S.C. § 2000e–5(f)(1). *See Hackett v. McGuire Bros., Inc.,* 445 F.2d 442, 445 (3d Cir.1971) (Statutory definition of an "employee" does not limit the right to bring Title VII actions to that class. The Act permits an "aggrieved person" to maintain a Title VII action, and this term has a broader meaning than "employee".); *Sibley,* 488 F.2d at 1341 ("the phrase 'person aggrieved' . . . can certainly be taken as comprehending individuals who do not stand in a direct employment relationship with an employer").

As the court in *Sibley* stated:

> To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

*Sibley,* 488 F.2d at 1341. Thus, the *sine qua non* of a claim under Title VII is not an existing or potential *formal* employment relationship between Dr. Mousavi and Beebe.

The Third Circuit has adopted a test to aid in evaluating when a relationship that is not truly one of employer-employee is nonetheless within the scope of Title VII. This test is a hybrid of the "right to control" standard and the "economic realities" standard. *E.E.O.C. v. Zippo Mfg. Co.,* 713 F.2d 32, 37 (3d Cir.1983). The former standard, which focuses on an employer's "right to control", was the standard by which the common law distinguished an independent contractor from an employee. *See United States v. Silk,* 331 U.S. 704, 714 n. 8, 67 S.Ct. 1463, 1468 n. 8, 91 L.Ed. 1757 (1947). The latter, broader standard was developed by the Court for use in deciding employee status for the purposes of social legislation. *Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1549–50, 91 L.Ed. 1947 (1947) (Social Security Act). Under this test, "employees are those who as a matter of economic reality are dependent upon the business to which they render service." [6]

The *Zippo* court approved a variety of factors to be considered in making a determination of employee status under the hybrid standard. These factors include:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.,* by one or

---

**6.** For a more complete explication of these two standards, see *Zippo,* 713 F.2d at 36–37. Acting in response to the *Silk* and *Bartels* cases, Congress rejected these cases' broad notion of the scope of the employer-employee relationship in the context of Social Security coverage. *See* S.Rep. No. 1255, 80th Cong., 2d Sess. (1948),

*reprinted in* 1948 U.S.Code Cong. & Admin. News 1752, 1753. *Cf.* H.R. No. 510, 80th Cong., 1st Sess., (1947), *reprinted in* 1947 U.S.Code Cong. & Admin.News 1135, 1137 (Taft–Hartley Act, explicitly exempting "independent contractors" from coverage of the National Labor Relations Act).

both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer'; (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties.

*Zippo*, 713 F.2d at 37 (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 832 (D.C.Cir. 1979). The question of employer control is very important in the matrix of factors identified in *Zippo. Id.*

Beebe argues that the *Zippo* factors compel a holding that Mousavi's claim does not come within the ambit of Title VII. Defendant's Post–Trial Memorandum 12–14. It urges the Court to come to the result reached in *Amro v. St. Luke's Hospital*, 39 F.E.P. 1574 (E.D.Pa.1986) [Available on WESTLAW, 1986 WL 766]. In *Amro*, the court found that the hospital did not stand in an employment relationship with a surgical resident who had applied for staff privileges. The court used the Third Circuit's *Zippo* analysis, emphasizing the importance of the control aspect. It found that although the surgeon "would be unable to practice his specialty without the use of a hospital's facilities" and "the defendant hospital can influence other hospitals across the country on their decision to hire Dr. Amro," *id.* at 1576, these factors were nonetheless insufficient to outweigh other indicia which tended to classify the doctor as an independent contractor. Those indicia included the facts that:

> the hospital does not pay the doctors who have staff privileges any salary, nor provide them with any retirement benefits, vacation plans or other forms of remuneration. It does not supervise their work or make any demands of the doctors.

*Id.*

The Court notes, however, that this description is not altogether accurate in the instant case. For example, the low-interest loan, the one-year's malpractice insurance, the guarantee as to billings, and the three-months' office rent provided to Dr. Hall, DX–1 at 5–6; Tr. A–108, could be con-

sidered to be "other forms of remuneration." Moreover, the fact that the neurologist contract initially restricted Dr. Hall to practice exclusively at Beebe, Tr. A–156, certainly qualifies as a demand made by the Hospital, as do the emergency call and residence requirements. DX–1 at 4. A further factor militates in favor of a determination that Beebe's relationship to Dr. Hall—and therefore, its potential relationship to Dr. Mousavi—is that of "employer" for Title VII purposes: The relevant community is quite small and employment opportunities limited; therefore, the hospital's ability to exert economic control is magnified. Tr. A–127–28, 140–41. This limited market for neurology services and the importance of the specialized neuro-diagnostic equipment in rendering those services, Tr. A–49, 136, are factors that give Beebe the requisite "highly visible nexus with the creation and continuation of direct employment relationships between third parties," *Sibley*, 488 F.2d at 1342, *i.e.*, private patients.

The Court notes that:

> [i]n prohibiting discrimination in employment on the basis of sex, "one of Congress' main goals was to provide equal access to the job market for both men and women." ... *Control over access to the job market may reside, depending upon the circumstances of the case, in ... an employer* as defined in Title VII....

*Sibley*, 488 F.2d at 1341 (citation omitted) (emphasis added). Having examined the particular circumstances of this case in light of Title VII's words and purpose and the related caselaw, the Court holds that Dr. Mousavi's potential relationship with the Hospital qualifies as an employment relationship for purposes of Title VII, and Dr. Mousavi has standing to bring suit under Title VII. *But see Nanavati v. Burdette Tomlin Mem. Hosp.*, 42 F.E.P. 197 (D.N.J.1986) [Available on WESTLAW, 1986 WL 15318].

## B. *Analysis Under Title VII*

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer ... to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The plaintiff in a Title VII case bears the burden of persuading the Court that she was discriminated against for an impermissible reason—here, sex—in an employment situation. To do this, she need not produce direct evidence of the employer's motivation, which may be difficult or impossible to obtain. Instead, the Supreme Court formulated a three-prong allocation of burdens of production in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Court clarified the *McDonnell Douglas* formula:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* at 252–53, 101 S.Ct. at 1093 (citations omitted), *quoted in Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.), *cert. dismissed,* —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815, (1987). In the following discussion, these three burdens will be examined in turn in relation to Dr. Mousavi's treatment by Beebe.

### 1. *Plaintiff's Prima Facie Case*

The plaintiff's first hurdle, that of establishing her *prima facie* case, is not a difficult one to clear. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The *prima facie* case may be established by a showing that (1) she belongs to a protected class (here, females); (2) she applied for and was qualified for the job in question; (3) she was denied the job; and (4) after the rejection, the employer continued to seek applicants with qualifications similar to plaintiff's. *See McDonnell Douglas,* 411 U.S. at 802, 90 S.Ct. at 1824; *Chipollini,* 814 F.2d at 897.

In the instant case, it is undisputed that Dr. Mousavi was a female neurologist qualified for the position, that she did not receive the position,[7] and that Beebe sought, and eventually hired, a similarly qualified neurologist, Dr. Hall. There exists a question, however, as to whether she actually applied for the job. If she did not, then she cannot establish a *prima facie* case.

### a. *The Question of Dr. Mousavi's Application for the Job*

Beebe contends that Dr. Mousavi has not made out a *prima facie* case under Title VII because she never formally applied for the position. Her own testimony shows that she was unsure as to what the position entailed, and as to what her application for staff privileges encompassed. Tr. A–199–200, B–50–53. In contrast, however, testimony of Beebe personnel shows that Dr. Mousavi was considered to be an applicant, at least up to a certain point in time. DX–9; PX–10; Tr. A–20 (Dr. Saberi); A–103 (Mr. Monihan); Cook Tr. 12–13. The Court is persuaded that, under the facts herein, Beebe's view and treatment of Dr. Mousavi as an applicant are sufficient to satisfy the requirement of a Title VII *prima facie* case that the plaintiff be an applicant for the position.[8] *See Holland v.*

---

**7.** It is undisputed that Mousavi does not hold the neurologist position at Beebe. However, it is disputed that she was *denied* the position, because Beebe argues that she was never actually an applicant. Defendant's Post–Trial Memorandum 11. As discussed *infra* Section 1.a., the Court finds that Dr. Mousavi was an applicant; accordingly, the fact that she does not hold the position signifies that she was denied the position.

**8.** The Court does not, however, wish to imply that the employer's intent constitutes the *sole* test of whether there has been an application. It is not a valid defense in a Title VII action for an employer to assert that it did not consider a

*Dole,* 591 F.Supp. 983, 35 F.E.P. 776 (M.D. Tenn.1984) (plaintiff not required to show actual application for promotion where it was clear her employer had considered her for the promotion).

The relationship between Beebe and Dr. Mousavi was not initiated by Dr. Mousavi. Dr. Saberi first introduced Beebe's need for a neurologist to Dr. Mousavi in late 1984, after Dr. Mousavi had moved to Sussex County, Tr. A–10, 172, and continued to encourage her to see patients at Beebe on consultations. Tr. A–173. Although she was initially "reluctant because of the distance," *id.,* Dr. Mousavi applied for courtesy staff privileges, received them on a temporary basis, PX–2; PX–3, and began to see patients at Beebe. Tr. A–173. During this time, minutes from meetings of both the Staff Development Committee and the Medical Executive Committee show that Dr. Mousavi was being considered for the neurology position. DX–9. Testimony from hospital personnel indicated that Dr. Mousavi was encouraged several times in informal settings to make a commitment to Beebe. *See, e.g.,* Tr. A–22–23 (Dr. Saberi); A–52 (Dr. Khorfan); A–190 (Dr. Mousavi).

Beebe argues that Dr. Mousavi could not "in any way be deemed an applicant because she declined to make the commitment which was prerequisite to consideration." Defendant's Post–Trial Memorandum 15. The Court declines to take this view. While a candidate's commitment to Beebe evidenced by a willingness to relocate appears to have been a requirement for that candidate's eventually being offered the position, *see* discussion *infra* Sections 2 and 3, it does not appear to have been necessary before any consideration of the physician could take place. The actions and attitudes of Beebe personnel belie this interpretation. In the Court's view, the more natural explanation is that Beebe initially considered Dr. Mousavi to be an applicant, but when her interest in relocating proved to be insufficient, she became an unsuccessful applicant.[9]

### 2. *Defendant's Burden: A Legitimate, Nondiscriminatory Reason*

■ Since Dr. Mousavi has made out a *prima facie* case, the burden now shifts to Beebe to show a legitimate, nondiscriminatory reason for its failure to select her as staff neurologist. Beebe's concern that it have a neurologist available on short notice to attend to the emergency needs of its patients is indisputably valid. The Hospital had had an unsatisfactory experience with the availability and response time of two neurologists from Milford with whom it had previously made arrangements to cover its neurology needs. Tr. A–26. It was, at least in part, the lack of success of these arrangements that convinced Beebe that a full-time neurologist, located in the immediate vicinity, was needed. Tr. A–27–28. The corollary requirement, that the neurologist have a "primary commitment" to Beebe, is also seen by the Court to be a legitimate and credible policy. These factors lead the Court to find that Beebe has successfully borne its burden of articulating a legitimate, nondiscriminatory reason for its failure to hire Dr. Mousavi.

### 3. *Plaintiff's Burden: Showing the Defendant's Reason to be a Pretext*

■ Since the Court finds Beebe's asserted reason for failing to appoint Dr. Mousavi to the position to be legitimate and nondiscriminatory, Dr. Mousavi must reshoulder the burden of showing that there was discrimination based on sex. The inference of discrimination arising out of the *prima facie* case "dissolves when

member of a Title VII protected class to be an applicant. Thus reducing the pool of applicants before the selection process even begins is not in harmony with the purposes of Title VII. *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, 14 F.E.P. 1514 (1977).

**9.** An alternative explanation might be that Dr. Mousavi was considered something of a "pre-ap-

plicant" who did not survive to the application stage because she did not display sufficient interest. To some extent, this seems to be the view held by Mr. Monihan and Mr. Cook. *See* Tr. 121; Cook Tr. 17. In any case, the fact that Beebe did consider her and her credentials in the context of its search for a neurologist is persuasive to the Court. *But see supra* note 8.

the employer shows a legitimate, non-discriminatory reason for the conduct." *Smithers v. Bailar,* 629 F.2d 892, 895 (3d Cir.1980) (discussing Title VII guidelines in an age discrimination context). Dr. Mousavi's burden of persuasion may be met "either directly by persuading the Court that a discriminatory reason more likely motivated [Beebe] or indirectly by showing that [Beebe's] proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095 (citing *McDonnell Douglas Corp. v. Green*). By claiming and attempting to show that Beebe's proffered reason was "pretextual," PTO 13, Dr. Mousavi has chosen the latter method. The Court, however, finds that Dr. Mousavi has not been successful in meeting her burden of persuasion.

■ Dr. Mousavi was required to show by a preponderance of evidence that Beebe's reason was merely a pretext. *Burdine,* 450 U.S. at 250, 101 S.Ct. at 1092. This she cannot do by relying upon the elements of her *prima facie* case. That is, Dr. Mousavi's evidence, if believed, tends to show nothing more than that she and Dr. Hall were not treated precisely the same. The disparate treatment that lies at the heart of her complaint[10] seems to be that Dr. Hall was offered and later received financial incentives, whereas no financial incentives were mentioned to her.[11] *See* Tr. B–24.

The Court agrees that financial incentives were discussed with Dr. Hall at a relatively early stage in his contacts with Beebe, Tr. A–102, B–49; Cook Tr. 18, in contrast to the types of discussions held with Dr. Mousavi. Tr. A–48, 85–86. There is, however, no evidence whatsoever that this difference was based on impermissible sex discrimination. Indeed, the Court finds the two candidates, Dr. Hall and Dr. Mousavi, to be differentiated in ways that were undoubtedly more meaningful to the Hospital than the fact that one was male and the other female. Dr. Hall contacted Beebe specifically in response to its ad for a neurologist. Tr. A–124. He made the trip to Delaware from Missouri several times, and evinced serious interest in relocating. Tr. A–64, 101–02. Dr. Mousavi, on the other hand, was contacted by Dr. Saberi and other members of Beebe's staff, and she did not apply even for courtesy staff privileges until urged. Tr. A–173. Attempts by Beebe personnel to ascertain her interest in relocating met with uncertain responses. Tr. A–30, 59. Her opening of an office in Lewes was seen as a manifestation of her reluctance to make a commitment to Beebe; she was "testing the waters" without incurring any substantial risk.[12] Tr. A–51, 113–14.

■ The Third Circuit has noted that in Title VII cases, any given evidence is not

10. Dr. Mousavi also seems to argue that she was treated differently than was Dr. Hall because she was never specifically made aware of the full-time neurologist position that was available. Tr. B–33–34. However, even if this is true, it seems more a result of the Hospital's lack of organization than of discrimination. Furthermore, Dr. Hall testified that the precise nature of the position was not made clear to him, either, when he began his contacts with Beebe. Tr. A–124–25.

11. The crucial second step in Dr. Mousavi's argument is that *if* she had known about an absolute requirement of moving to the Lewes area, and *if* she had known that there were financial incentives available, she would certainly have moved to the Lewes area and become Beebe's neurologist. However, the Court has grave doubts about the inevitability of this conclusion. Beebe's judgment at the time was that Dr. Mousavi was not particularly enthusiastic about making the move. *See, e.g.,* Tr. A–51–52. Even on

the stand, her testimony in this regard was notably equivocal at times: she would have "probably moved," Tr. B–15; she and her husband "would certainly have considered" moving. Tr. A–191.

12. Dr. Mousavi's contention appears to be that her opening a Lewes office should have indicated her desire to relocate. Tr. A–193. While this may be a possible interpretation, the Court does not believe the Hospital's opposing view of this action—characterized by Dr. Khorfan as "a little trick", Tr. A–51—was implausible or discriminatory, especially given Dr. Mousavi's lukewarm responses to making the commitment, *see, e.g.,* Tr. A–45–46 (Dr. Khorfan); A–113–14, 122 (Mr. Monihan), and her admitted knowledge of the "primary location" requirement. Tr. B–31 (Dr. Mousavi's testimony that she understood she would have to give up her Seaford commitment); *but compare* Tr. B–35–36 (Dr. Mousavi's testimony that she thought she could retain her primary office in Seaford).

limited to use at only one phase of the case. Indeed, "the defendant's evidence may not only present legitimate reasons for its decision, but also may so undermine the credibility of the plaintiff's testimony that the believable evidence no longer establishes a prima facie case." *Dillon v. Coles,* 746 F.2d 998, 1001 (3d Cir.1984). Thus, it is permissible for the Court to compare and weigh evidence presented by defendant in making its rebuttal against that presented by plaintiff in her attempt to show that there was sex discrimination or that defendant's reason was a pretext. Dr. Mousavi presented no evidence that Beebe's decision was motivated by discriminatory intentions, nor any evidence convincing to the Court that Beebe's reason was a pretext.[13] In contrast, the Court finds Beebe's evidence as to its nondiscriminatory reason to be credible and convincing.

## CONCLUSION

For the reasons discussed hereinabove, the Court finds that the plaintiff, Dr. Mousavi, has failed to meet her burden of persuasion under Title VII that she was discriminated against by Beebe Hospital on the basis of sex.

An Order will enter for the defendant, Beebe Hospital, in accordance with this Opinion.

---

**13.** Such evidence might have been present had Dr. Hall been shown to be significantly less qualified than Dr. Mousavi, which was plainly not true. Tr. A–139. Neither did Dr. Mousavi present evidence that any person at Beebe had ever questioned her directly about problems that may arise due to her being female and a mother, or had ever commented on such factors in meetings or informally. *Cf. Earnhardt v. Puerto Rico,* 582 F.Supp. 25, 34 F.E.P. 1837 (D.P.R.1983), *aff'd.,* 744 F.2d 1 (1st Cir.1984) (finding that "nondiscriminatory" reason was pretextual in Puerto Rican defendant's discharge of white plaintiff supported by defendant's reference to plaintiff as "gringo" and "American").