**Dr. Carol L. BENDER**

v.

**SUBURBAN HOSPITAL, et al.**

**Civil Action No. DKC 97–629.**

United States District Court, D. Maryland.

March 25, 1998.

Lisa J. Saks, Law Office, Washington, DC, Margaret M. Zwisler, Laura S. Shores, Howrey & Simon, Washington, DC, for Carol L. Bender, M.D.

S. Allan Adelman, Godard, West and Adelman, Rockville, MD, Stanley Mazaroff, Venable, Baetjer and Howard, Baltimore, MD, Brian M. Peters, Law Office, Jonathan B. Sprague, Law Office, A. James Johnston, Post & Schell, PC, Philadelphia, PA, for Suburban Hospital, Inc., William Minogue, M.D.

S. Allan Adelman, Godard, West and Adelman, Rockville, MD, Stanley Mazaroff, Venable, Baetjer and Howard, Baltimore, MD, for

Board of Trustees of Suburban Hospital, Inc., John W. Barrett, Richard Byrne, M.D., John Eng, M.D., Don Fontana, M.D., Antoni Goral, M.D., Brian Grissler, Jay Grodin, M.D., Wendell Holloway, Patricia Kellogg, M.D., Harris Kenner, M.D., Lawrence Kline, Sydney Malawer, M.D., IRA Miller, M.D., Richard Pollen, M.D., Robert Rothstein, M.D., John Saia, M.D., Joel Schulman, M.D., Robert Snider, Michael Stanton, M.D., Roger Titus, Alan Wolland, M.D.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Plaintiff Dr. Carol L. Bender sued Suburban Hospital, Inc. ("Suburban"), Suburban's Senior Vice–President for Medical Affairs Dr. William Minogue, the Suburban Hospital Board of Trustees ("Board of Trustees") and a number of physicians who were affiliated with Suburban in various capacities (the "Individual Defendants"), under Title VII, 42 U.S.C. § 2000e *et seq.*, alleging gender discrimination and retaliation. Presently pending are a Motion to Dismiss filed jointly by Suburban Hospital, Inc. and Dr. Minogue (the "Suburban Motion"), a Motion to Dismiss filed by the Individual Defendants, a Motion to Strike, or dismiss, the Suburban Hospital Board of Trustees as a defendant, and Dr. Bender's motion to strike or dismiss the motion regarding the Board of Trustees. A hearing was held on September 22, 1997.

### I. Standard of Review

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss, the court must consider well pled allegations in a complaint as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Allegations are to be construed in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Courts need not, however, assume the truth of legal conclusions couched as factual allegations. *See Papasan v. Allain,* 478 U.S. 265,

286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *see also Clegg v. Cult Awareness Network,* 18 F.3d 752, 754–755 (9th Cir.1994) (citing *Papasan* and noting that the court is not required to accept conclusions that cannot reasonably be drawn from the facts alleged).

As Suburban notes, the purpose of FED. R. CIV. P. 12(b)(6) is to "streamline litigation by dispensing with needless discovery and fact finding." *Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). The Federal Rules do not, with immaterial exceptions, require that a complaint describe alleged wrongdoing with any particularity. FED. R. CIV. P. 8(a)(2); *Comet Enter. Ltd. v. Air–A–Plane Corp.,* 128 F.3d 855, 860 (4th Cir.1997). Additionally, as Plaintiff notes, courts have expressed some reluctance to dismiss Title VII cases at the pleading stage. *See Logan v. General Fireproofing Co.,* 521 F.2d 881, 883 (4th Cir.1971); *Mitchell v. Frank R. Howard Memorial Hosp.,* 853 F.2d 762, 766 (9th Cir. 1988), *cert. denied,* 489 U.S. 1013, 109 S.Ct. 1123, 103 L.Ed.2d 186 (1989). However, "if a plaintiff chooses to 'plead particulars, and they show that he has no claim, then he is out of luck—he has pleaded himself out of court.'" *Jefferson v. Ambroz,* 90 F.3d 1291, 1296 (7th Cir.1996) (quoting *Thomas v. Farley,* 31 F.3d 557, 558–559 (7th Cir.1994)); *see also Northern Trust Co. v. Peters,* 69 F.3d 123, 129 (7th Cir.1995) ("More is not necessarily better under the Federal Rules; a party 'can plead himself out of court by unnecessarily alleging facts which ... demonstrate that he has no legal claim.'") (quoting *Trevino v. Union Pac. R.R.,* 916 F.2d 1230, 1234 (7th Cir.1990)). Dr. Bender's lengthy complaint detailing the relationships at issue is just such a case.

### II. Relevant Factual Allegations

For the purposes of Suburban's motion, the court assumes the veracity of the following factual allegations drawn from the Amended Complaint. Since 1977, Dr. Bender has maintained a private practice in internal medicine in Rockville, Maryland. In 1977, she obtained staff privileges at Suburban, located in Bethesda, Maryland. Plain-

tiff also has held staff privileges at Shady Grove Adventist Hospital in Rockville.

Suburban, through its Board of Trustees, grants medical staff appointments and privileges to qualified physicians. These privileges generally authorize a physician to admit patients to the hospital, to provide clinical services and treatment to a physician's patients at Suburban, to issue orders for medication and procedures, and to request ancillary services to be performed by Suburban staff members. A physician who does not hold staff privileges at Suburban is not entitled to perform these tasks or to make use of the hospital's resources in providing care to patients. Dr. Bender benefited from her privileges by admitting and treating her own patients at Suburban. Plaintiff was party to a coverage group agreement with other physicians who provided services to each other's patients when that patient's physician was unavailable. The privileges allowed Dr. Bender to admit and treat these patients at Suburban, and the coverage agreements mandate that all parties thereto maintain privileges at Suburban. Plaintiff also provided consultations regarding patients of other specialists when such patients were hospitalized at Suburban. The hospital furnished equipment and staff to assist in examining and treating patients, dictation and transcription services, and office space for record keeping and ordering. Suburban offered continuing medical education classes, a medical library of current journals and text books, an on-line medical research service, use of a doctors' lounge, reserved parking and discounts at the hospital cafeteria, and reduced charges for medical care provided to members of her family. Dr. Bender also received frequent referrals to her private practice through Suburban's physician referral program and the "on-call" roster. Plaintiff's service as the internist "on-call" to Suburban's emergency room contributed to the enlarging of the patient base in her practice. Her privileges allowed Plaintiff to serve at various times on Suburban's "on-call" roster of physicians available to care for Hospital patients in emergency situations and to assist emergency room physicians by provid-

ing consultations on cases within her specialty. Many current patients have, and will, no longer utilize Dr. Bender's services because of the loss of her Suburban privileges, and many prospective patients will choose other physicians when informed that Plaintiff does not have privileges at Suburban.

Physicians with staff privileges must comply with hospital regulations regarding licensing, insurance, record keeping, and continuing education. These physicians must participate in the Hospital's quality assurance, risk management, and utilization review programs, serve on committees, and pay annual dues to the Medical Staff. The hospital regulations also permit the hospital to establish "activity requirements" based on practice patterns of a physician's specialty and Suburban's needs.

Privileges are generally granted for a period of two years and must be renewed at the end of the period. In making determinations on initial grants of privileges and renewals, Suburban's bylaws call for the Board of Trustees to consider recommendations of the hospital's medical staff. Applications for reappointment are reviewed and passed upon by the Credentials Committee of the Medical Staff and then by the Medical Staff Executive Committee. The Board of Trustees only makes a determination following input from the Medical Staff Executive Committee. In June, 1992, Dr. Bender sought reappointment to Suburban's active medical staff and renewal of her privileges for 1993–1994. For reasons that are not immediately relevant to Suburban's motion, the acrimony between Plaintiff and Suburban became apparent during this process. It is sufficient at this juncture to note that Dr. Bender alleges that her privileges were terminated in a discriminatory manner. Dr. Bender filed a complaint with the State of Maryland Commission on Human Relations and the Equal Employment Opportunity Commission on August 4, 1993. Plaintiff has alleged that the hospital retaliated on account of this complaint and she filed a second administrative charge in March, 1996.

In conjunction with the termination of her privileges, Suburban filed an adverse action report with the National Practitioners Data Bank, which was established to collect and disseminate information adversely affecting physicians' privileges. This report was required by the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 *et seq.* Dr. Bender has alleged that the presence of this report indirectly hampers her efforts to maintain privileges at Shady Grove Adventist Hospital and that it interferes with her ability to become associated with preferred provider organizations and other hospitals.

Plaintiff's Amended Complaint contains seven counts. Counts I and II seek relief under Title VII, 42 U.S.C. § 2000e *et seq.*, on the grounds that Suburban discriminated against Plaintiff on the basis of gender in denying her privileges and retaliated against her for filing discrimination complaints. Count III states a common law claim for defamation against Suburban and Dr. Minogue. Count IV alleges a breach of contract by Suburban. Count V alleges intentional interference with contractual relations on the part of all Defendants. Count VI alleges intentional interference with prospective economic advantage against all Defendants. Finally, Count VII alleges intentional interference with prospective economic advantage specifically against Suburban and Dr. Minogue.

### III. Parties' Positions

Defendant Suburban has moved to dismiss the Title VII allegations on the grounds that: (1) Plaintiff's action is untimely; (2) a decision by the Maryland Court of Special Appeals collaterally estops Plaintiff from litigating claims regarding the nature of her relationship with Suburban[1]; and (3) Plaintiff is unable to state that she was an employee of any entity, and that this failure precludes relief under Title VII. Plaintiff responds that this suit was commenced in a timely fashion and that she was employed by Suburban.

In the alternative, Plaintiff asserts that Suburban still faces Title VII liability as an employer who interfered in the employment relationship between Dr. Bender and other parties. It will only be necessary to address ground (3).

### IV. Analysis

It is axiomatic that a plaintiff must allege the existence of an employment relationship in order to state a Title VII claim. By definition, an employment relationship involves an employer and an employee. The parties do not dispute that Suburban is an employer for Title VII purposes. *See* 42 U.S.C. § 2000e(b) (defining employer as a "person ... who has fifteen or more employees during a specified period of time."). This case, however, presents the issue of whether Dr. Bender was an employee covered under Title VII. *See e.g. Cilecek v. Inova Health System Services*, 115 F.3d 256, 263 (4th Cir. 1997), *cert. denied,* ___ U.S. ___, 118 S.Ct. 694, 139 L.Ed.2d 639 (1998) (concluding that plaintiff was an independent contractor rather than an employee and thus could not sustain a Title VII action). An "employee" is "an individual employed by an employer." 42 U.S.C. § 2000e(f). The *Cilecek* opinion noted that this circular definition "left the term 'employee' essentially undefined insofar as an employee is to be distinguished from an independent contractor." *See id.* at 259.

### A. Direct Employment Relationship

In opinions prior to *Cilecek,* the Fourth Circuit applied a twelve-factor test to determine whether a plaintiff was an independent contractor or an employee. *See e.g., Garrett v. Phillips Mills, Inc.,* 721 F.2d 979, 982 (4th Cir.1983). Known as the "hybrid test," this method combines the common law element of control by the hiring party over the hired party's work with an analysis of the degree of economic dependence of the worker on the putative employer. 1 L. Larson,

---

1. *See State Comm'n on Human Relations v. Suburban Hosp., Inc.,* 113 Md.App. 62, 686 A.2d 706 (1996). The Court of Appeals of Maryland has mooted this issue by vacating the Court of Special Appeals' decision. *See State Comm'n on Human Relations v. Suburban Hosp., Inc.,* 348 Md. 413, 704 A.2d 445, 447 (1998) (holding that after the Court of Special Appeals held that the appeal was moot it had no authority to decide the nature of Dr. Bender's relationship with Suburban).

Employment Discrimination § 4.02 (2d ed.1994). As first pronounced by the United States Court of Appeals for the District of Columbia in *Spirides v. Reinhardt,* 613 F.2d 826, 832 (D.C.Cir.1979), the common-law-derived control element is the most important factor. *See Garrett,* 721 F.2d at 982. The economic reality considerations include:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* at 982 (quoting *Spirides*). Although *Garrett* was an Age Discrimination in Employment Act case, the Fourth Circuit applied the same factors to Title VII in *Haavistola v. Community Fire Co. of Rising Sun,* 6 F.3d 211 (4th Cir.1993).

In *Cilecek,* the Fourth Circuit modified the hybrid test to make it more applicable to the hospital context. *See Cilecek,* 115 F.3d at 260–261. In the Fourth Circuit's view, the hybrid test's emphasis on control required adaptation to reflect the realities of hospital settings. *Id.* at 260. In such settings, the "doctor must have direct control to make decisions for providing medical care, but the hospital must assert a degree of conflicting control over every doctor's work—whether an employee, an independent contractor, or a doctor merely with privileges—to discharge its own professional responsibility to patients." *Id.*

The Fourth Circuit did not elaborate what it meant by adding a third class of "doctor[s] merely with privileges" to those who are employees or independent contractors. Cases cited by the parties, or identified by the court, only classify physicians as either independent contractors or employees. This language must mean that there exists a continuum with "doctors merely with privileges" being even further removed from employee status than are independent contractors. At the other end of the continuum are physician-employees, doctors employed by a hospital on a full-time basis to treat the hospital's patients. *See, e.g., Mousavi v. Beebe Hosp., Inc.,* 674 F.Supp. 145 (D.Del.1987), *aff'd,* 853 F.2d 919 (3d Cir.1988) (illustrating that such physicians are employees). The *Cilecek* opinion clearly depicts a circumstance where a hospital's independent contractor agreement with a physician obligates the doctor to serve the hospital's patients. The "mere privilege" category apparently contemplates doctors whose privileges grant them access to hospital facilities to treat their own patients but require no commitment to use the facilities or to treat a hospital's patients.

Dr. Bender alleges that eligibility for Suburban's "on-call" physician program requires that a physician have privileges at Suburban and that she participated in this program at various points in time. While participation in the on-call program may entail being more than a physician who "merely has privileges," the Amended Complaint speaks only to Dr. Bender's lost opportunity to take part in the program in the event that she had privileges and chose to return to "on-call" status. The Amended Complaint does not assert that she was in the program during the period when the allegedly discriminatory conduct occurred. Also, in listing the benefits of her employment, Dr. Bender does not claim that Suburban compensated her for these services. Rather, Dr. Bender asserts that the on-call service increased her patient base.

Dr. Bender further alleges that the grant of privileges involved obligations to follow hospital rules and participate in certain hospital activities. In furtherance of these obligations, Dr. Bender attended staff meetings, complied with license, education and insurance requirements, and served on hospital committees. All of these obligations, howev-

er, further the hospital's interest in properly discharging its professional responsibilities rather than indicate that the physician must use the hospital facilities. The *Cilecek* opinion demonstrates that hospitals have the ability to place some administrative obligations on physicians with privileges in order to fulfill the hospital's professional responsibility. *See Cilecek,* 115 F.3d at 260; *see also Robb v. United States,* 80 F.3d 884, 889 (4th Cir.1996) (citing *Wood v. United States,* 671 F.2d 824 (4th Cir.1982) for the proposition that analysis of control in the hospital setting should not focus on "peripheral, administrative acts"). In brief, obligations to participate in non-treatment related administrative activities do not transform doctors merely with privileges into independent contractors or employees. Finally, the Amended Complaint states that the hospital's bylaws provide that physicians may be subject to "activity requirements." There is no allegation, however, that Suburban actually enacted or enforced any such requirement. Therefore, Dr. Bender has failed to allege that she was more than a "doctor merely with privileges" at Suburban.

Even under the hybrid test, Dr. Bender has, at best, alleged that she was an independent contractor rather than an employee. *Cilecek* modified the hybrid test and made the following factors relevant to determining whether a doctor is an employee or an independent contractor of a hospital:

(1) the control of when the doctor works, how many hours he works, and the administrative details incident to his work; (2) the source of instrumentalities of the doctor's work; (3) the duration of the relationship between the parties; (4) whether the hiring party has the right to assign additional work to the doctor or to preclude the doctor from working at other facilities or for competitors; (5) the method of payment; (6) the doctor's role in hiring and paying assistants; (7) whether the work is part of the regular business of the hiring party and how it is customarily discharged; (8) the provision of pension benefits and other employee benefits; (9) the tax treatment of the doctor's income; and (10) whether the parties believe they have created an employment relationship or an independent contractor relationship.

*Cilecek,* 115 F.3d at 261. Thus, the *Cilecek* standard adds to the traditional hybrid test the elements of control over hours worked, assignment of patients and exclusivity, and control over assistants, while deleting concerns regarding supervision, the level of skill involved, method of termination, and provision of annual leave. Both tests share the questions of the supplier of instrumentalities, duration of the relationship, payment methods, pension and benefits, integral part of hiring party's business, tax treatment, and intention.

In *Cilecek,* the Fourth Circuit found that the parties had expressly intended to create an independent contractor relationship, that Dr. Cilecek controlled the number of hours he worked at the hospital, that he had freedom to work for others including competitors, that he was paid for work he did and not a uniform salary, that other than liability insurance he funded his own pension and benefits, and that income was treated for tax purposes as an independent contractor. *Cilecek,* 115 F.3d at 261. The opinion notes, "Cilecek exercised an independence from Emergency Physicians that enabled him to determine his hours, his income, and who he worked for. These are core incidents to a work relationship that are inconsistent with employee status." *Id.*

Similarly, Dr. Bender's relationship with Suburban was "inconsistent with employee status." Her detailed allegations reveal that she had complete discretion regarding whether to treat patients at Suburban, that Suburban had no right to assign her additional work or preclude her from working at other facilities or for competitors, that Suburban never paid her, that employment benefits were few (cafeteria discounts, discounts on care, and reserved parking). Dr. Bender does not allege that she was part of Suburban's pension plan. The Amended Complaint informs the court that Suburban provided many of the instrumentalities of the doctor's work, that Dr. Bender's association with Suburban was longstanding, and that Dr. Bender was able to use Suburban staff for nursing and clerical support.

The Fourth Circuit stated in *Cilecek* that although the significance of these facts "to whether an employment relationship or an independent contractor relationship was created [may be] vigorously debated, resolution of that debate is a question of law." 115 F.3d at 261. In this case, the factual elements have been stated with such particularity that the court can assume the veracity of Plaintiff's allegations and resolve that the allegations overwhelmingly demonstrate that Dr. Bender was, at most, an independent contractor. If Dr. Cilecek was not an employee largely because he was able to control his own hours, income, and "who he worked for," then Dr. Bender certainly is not an employee.[2]

This result cannot come as a surprise, as it is consistent with the outcome of numerous cases analyzing physician-hospital relationships. Although these opinions arose at various points in proceedings and do not all apply identical legal standards, they share a common result by holding that physicians are not employees of privilege-granting hospitals. *See Cilecek*, 115 F.3d at 261; *Alexander v. Rush North Shore Med. Center*, 101 F.3d 487, 492–493 (7th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 54, 139 L.Ed.2d 19 (1997); *Diggs v. Harris Hospital–Methodist*, 847 F.2d 270, 272–273 (5th Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988); *Pardazi v. Cullman Medical Center*, 838 F.2d 1155, 1156 (11th Cir.1988); *Pamintuan v. Nanticoke Memorial Hospital, Inc.*, 1997 WL 129338, *9–11 (D.Del. Feb.24, 1997); *Johnson v. Greater Southeast Com-munity* Hosp., 903 F.Supp. 140, 154 (D.D.C. 1995) (noting that plaintiff-physician admitted he was not an employee of the hospital); *Amro v. St. Luke's Hospital of Bethlehem*, 1986 WL 766, * 3 (E.D.Pa. Jan.13, 1986); *Beverley v. Douglas*, 591 F.Supp. 1321, 1327 (S.D.N.Y.1984).[3]

### B. Third Party Employment

A plaintiff may be able to seek relief under Title VII if she can allege that a defendant, who is a Title VII employer, interfered in her role as an employee of other employers. The Seventh Circuit outlined such a claim as stating the issue of "whether an employee of employer X may bring a Title VII action against employer Y when Y is not his employer, but merely someone whose discriminatory conduct interferes with his employment with employer X." *Alexander*, 101 F.3d at 493–494 n. 2. Plaintiff has not cited a Fourth Circuit opinion that addresses the availability of this type of claim.

As Plaintiff notes, a number of courts interpreting Title VII have allowed a plaintiff to claim interference in third-party relationships. *See e.g., Sibley Memorial Hosp. v. Wilson*, 488 F.2d 1338, 1342 (D.C.Cir.1973) (male private duty nurse alleging that hospital's supervisory nurses denied him opportunities to treat female patients stated Title VII claim for interference with employment opportunities with patients); *Vanguard Justice Soc'y, Inc. v. Hughes*, 471 F.Supp. 670, 696–697 (D.Md.1979) (adopting *Sibley* rationale to find that City of Baltimore, while not

---

**2.** Absence of evidence regarding the one missing factor—the parties' belief/intent as to the nature of the relationship—does not mandate that this case proceed through discovery. Further, the court is not persuaded by counsel's argument on behalf of Dr. Bender that discovery may yield additional information regarding benefits of her relationship with Suburban. It is difficult to conceive that Dr. Bender is not in position, even without discovery, to know what benefits she received during her association with Suburban. Dr. Bender's Amended Complaint detailed these benefits.

**3.** Cases holding that an employment relationship was either satisfactorily pled or proven have relied on particular factors that distinguish them from typical physician-hospital cases. *See e.g., Mitchell*, 853 F.2d at 766–767 (focusing on com-pensation agreement pursuant to which the hospital would pay plaintiff 40 percent of the radiology department's gross billings). Other cases are distinguishable in that they improperly merge the consideration of interference in third-party employment relationships with the question of whether the hospital and physician had an employment relationship. *See e.g., Pao v. Holy Redeemer Hosp.*, 547 F.Supp. 484 (E.D.Pa. 1982) (focusing on the doctor's need to use the hospital's retinal facilities to treat his patients); *Mallare v. St. Luke's Hosp. of Bethlehem*, 699 F.Supp. 1127 (E.D.Pa.1988) (noting that the privilege decision had great impact on the physician's practice as there was only one hospital in the local area). Reliance on a hospital's facilities is not a factor incorporated within the *Cilecek* test.

the direct employer of Baltimore police officers, exercises sufficient control over budget and testing of applicants at Baltimore City Police Department to subject it to Title VII suit for alleged discrimination within Department). Although the *Sibley* case is widely seen as the seminal case in this area, courts adopting its holding have varied in the extent of third party relationships covered.

The main dissatisfaction with *Sibley* arises because the D.C. Circuit failed to explain why the relationship subject to the interference—the nurse-patient relationship—was an employment relationship. *Sibley* was issued roughly six years before the D.C. Circuit pronounced the hybrid test in *Spirides*. Subsequent courts have expressed difficulty with the D.C. Circuit's assumption of an employment relationship. As a result, a number of cases have held that a third-party Title VII claim cannot be stated for interference in the physician-patient relationship which is an independent contractor relationship. *See, e.g., Alexander*, 101 F.3d at 493 n. 2, *Mitchell*, 853 F.2d at 767; *Diggs*, 847 F.2d at 273–274; *Johnson*, 903 F.Supp. at 154–156; *Beverley*, 591 F.Supp. at 1328.

Dr. Bender's Amended Complaint similarly fails to explain why her relationship with patients constitutes an employer-employee relationship. It cannot be questioned that the typical doctor-patient relationship clearly lacks the elements of control or the economic factors necessary to define an employment relationship. Therefore, even if proven, Dr. Bender's allegations regarding interference in her relationship with present and potential patients does not permit Title VII recovery.[4]

Additionally, the other relationships labeled by Dr. Bender as employment relationships are actually independent contractor relationships. Dr. Bender does not assert that she is an employee of the other physicians in her coverage group or of Shady Grove. In fact, nothing in the complaint indicates that Dr. Bender was more than a physician who merely had privileges at Shady Grove. Further, Dr. Bender does not allege that she would be an employee, rather than an independent contractor with, the preferred provider organizations. It is impossible to conclude that application of the hybrid test would reveal these relationships to be employment relationships. Finally, the allegations regarding interference with potential positions as a hospital staff physician are too vague to support relief. Without even an attempt to apply for other positions, it appears impossible for Dr. Bender to demonstrate that any interference has occurred. Dr. Bender's assumptions alone, even if likely given standard practices in the medical field, cannot be the basis for relief. Even if generally viable, third-party interference claims cannot be available when the potential interference is so remote as to make Title VII's sweep endless. *See* 1 L. Larson, Employment Discrimination, § 4.01[2].

As a result, this court concludes that Dr. Bender's extensive Amended Complaint fails to allege interference with a third-party relationship within which she is an employee rather than an independent contractor. Although the complaint labels the relationship between Dr. Bender and third parties as "employment relationships," Dr. Bender does not expressly claim to be an employee of the third parties. The factual allegations make it obvious that when Dr. Bender uses this term she states a legal conclusion that inaccurately characterizes the referenced relationships. As stated above, the court is not required to accept such a conclusion as true for the purposes of this motion. Therefore, even if *Sibley* and its progeny provide a remedy, the extension of Title VII to third-party relationships does not provide Dr. Bender a basis for relief. No "employment relationship" can reasonably be drawn from the extensive facts alleged. Thus, Counts I and II do not state a claim upon which relief can be granted.

### C. Timeliness Issue and Other Counts

As a result of the above, the objections regarding timeliness are moot. Additionally, in the absence of an independent basis for jurisdiction, the court will not exercise pendent jurisdiction over the state law counts.

---

4. Physician-patient cases are to be contrasted with cases involving physicians employed by medical groups. *See e.g., Pardazi v. Cullman* *Med. Ctr.*, 838 F.2d at 1156 (11th Cir.1988); *Gomez v.. Alexian Bros. Hosp.*, 698 F.2d 1019, 1021–22 (9th Cir.1983).

*See* 28 U.S.C. § 1367(c)(3); *see also United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). This resolution affects not only the allegations against Suburban and Dr. Minogue, but also the allegations against the individual Defendants. Therefore, the court dismisses Counts III–VII without prejudice. Consequently, the remaining motions are moot.

### V. *Conclusion*

For the foregoing reasons, Suburban's Motion to Dismiss is GRANTED and Plaintiff's Amended Complaint is Dismissed. All other motions are DENIED as moot. A separate order will be issued.