**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JAMES W. CILECEK, M.D.,
Plaintiff-Appellant,

v.

INOVA HEALTH SYSTEM SERVICES;
EMERGENCY PHYSICIANS OF NORTHERN
VIRGINIA, LIMITED; THOM A. MAYER,
M.D., individually and in his
capacities as Chairman of the
Department of Emergency Medicine
of Fairfax Hospital, INOVA Health

System Services and as President of
Emergency Physicians of Northern
Virginia, Limited; JOAN MILES, R.N.,
individually, and in her capacity as
Administrator of Access Emergency
Care of Reston, INOVA Health
System Services,
Defendants-Appellees.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
Amicus Curiae.

No. 96-1317

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-95-1434-A)

Argued: January 27, 1997

Decided: June 2, 1997

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Motz joined. Judge Murnaghan wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Lois G. Williams, HOWREY & SIMON, Washington, D.C., for Appellant. Paul Charles Skelly, HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Moira T. Roberts, HOWREY & SIMON, Washington, D.C., for Appellant. Jonathan T. Rees, HOGAN & HARTSON, L.L.P., Washington, D.C.; HOGAN & HARTSON, McLean, Virginia, for Appellees Emergency Physicians and Mayer; Anthony J. Trenga, Michael L. Zupan, HAZEL & THOMAS, Alexandria, Virginia, for Appellees Inova Health System and Miles. C. Gregory Stewart, General Counsel, Gwendolyn Young Reams, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, Jennifer S. Goldstein, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C.; Deval L. Patrick, Assistant Attorney General, Isabelle K. Pinzler, Deputy Assistant Attorney General, Dennis J. Dimsey, Eileen Penner, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

_____

**OPINION**

NIEMEYER, Circuit Judge:

We must decide in this case whether Dr. James W. Cilecek, a physician under contract to provide emergency medical services at two hospitals, was an employee covered by Title VII of the Civil Rights Act of 1964 or an independent contractor and therefore not so covered. Based on the undisputed facts about the incidents of the relationship, we conclude as a matter of law that Cilecek was an independent contractor, and therefore we affirm the summary judgment entered by the district court in favor of the defendants.

2

I

Inova Health System Services, a Virginia corporation, owns and operates several health care facilities in northern Virginia, including Fairfax Hospital and ACCESS of Reston. In March 1989, Inova entered into an exclusive contract with Emergency Physicians of Northern Virginia, Ltd. ("Emergency Physicians"), under which Emergency Physicians agreed to staff Fairfax Hospital and ACCESS of Reston with emergency physicians. At the time, Dr. James W. Cilecek had worked at those facilities as an emergency physician for about five years. After Emergency Physicians obtained the contract with Inova, Cilecek wrote Dr. Thom Mayer, Emergency Physicians' CEO and owner:

> As discussed, I will work as an independent contractor covering an average of 120 hours per month . . . . Compensation will be $80/hour and the group will provide liability insurance with tail coverage. In the event that we decide to change our agreement, I will notify you at least 60 days in advance and would ask that you provide similar notification.

In August 1991, Cilecek reduced his hours worked for Emergency Physicians and began working for Mary Washington Hospital in North Stafford, Virginia, a non-Inova facility. But in December 1992 he returned full time to Emergency Physicians, at which time Emergency Physicians and Cilecek restated a relationship that both believed was an independent contractor relationship. In summarizing the resumed relationship, Cilecek wrote Mayer:

> This letter is to confirm our discussion of October 15 in which we agreed that I would resume full-time status with the Fairfax Emergency Department commencing December 1, 1992.

\* \* \*

> Total hours will average 130-140 hours/month with no less than 100 hours and with increase to 180 hours during periods of need. Compensation will be, under Independent Con-

3

tractor status, $90/hour with malpractice being paid by the group.

In July 1994, Cilecek wrote the clerk who scheduled Emergency Physicians' shifts, "I will be reducing my shifts temporarily this fall" to work on a "large" personal project and to work "a few shifts" at another medical facility. When Cilecek received the draft schedule for September and October 1994, he learned that he was being assigned even fewer shifts than he had wished, and he objected. He wrote a letter stating that despite his request for five to six shifts in September and six to eight shifts in October on any of eighteen specified dates, the draft schedule showed him working only five shifts in September and two in October. Emergency Physicians refused to adjust the schedule. Instead, it wrote a letter terminating the relationship between the parties because "it is in the best interest of both parties." While Emergency Physicians terminated the relationship effective November 1, 1994, it offered to pay Cilecek through December on the basis of ten shifts. In response to Emergency Physicians' termination, Cilecek wrote:

> At this time, there has been no attempt on your behalf to restore my shifts in the September-October schedule. Further, I understand you wish for me to sign an agreement of termination effective November 1, 1994. Given my recent testimony in the legal action, Lowe vs. INOVA, I conclude that you are taking retaliatory action against me. Such retaliation is unlawful.

> I do not agree that it is in the best interest of both parties to terminate our working agreement.

Cilecek was referring in his letter to testimony that he had given in a deposition on August 23, 1994, in support of a former employee's claim against Inova for sexual harassment.

Dr. Cilecek filed this action against both Inova and Emergency Physicians under Title VII of the Civil Rights Act of 1964, alleging that he was terminated in retaliation for giving testimony in a former employee's sexual harassment suit. On the defendants' motion for summary judgment, the district court concluded that Cilecek was not

4

an employee of either Inova or Emergency Physicians, but rather an independent contractor, and that therefore he was not covered by Title VII. The court summarized the incidents of the relationship on which it relied to reach its conclusion as follows:

> There is more in this case than how the taxes are treated. This plaintiff asked to be an independent contractor, he contracted with his employer to be an independent contractor. He has testified under oath in another hearing that he was an independent contractor. He worked for others at times and had the opportunity and the latitude to work for others. He was not bound by any noncompetition agreement as other similarly situated employees at the Emergency Physicians. He didn't receive the same benefits. He didn't receive the same tax treatment. His duties and his scheduling were different than regular employees. He wasn't required to be on call. He designated his own shifts. And he was not supervised basically in the providing of care even though he did use their equipment.

> I believe simply with these differences in a regular employee, that simply the fact that he was paid by them and used the equipment that they provide in their facility does not make him an employee. And when you add all these up, I find that it is clear that he was an independent contractor and not covered by the federal Act.

The court dismissed pendent state law claims without prejudice to their prosecution in state court. This appeal followed.

II

Title VII of the Civil Rights Act prohibits employers from retaliating against their employees for testifying in support of an employment discrimination claim. See 42 U.S.C.§ 2000e-3. The Act defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). And "employer" is defined as a "person . . . who has fifteen or more employees" during a specified period of time. 42 U.S.C. § 2000e(b). In adopting this circular definition, Congress has left the term "employee" essentially undefined insofar as an employee is to

5

be distinguished from an independent contractor. The parties to this case agree that Title VII does not cover an independent contractor.

It now appears to be settled that when Congress uses the term "employee" in a statute without defining it, the courts will presume that Congress intended to describe "the conventional master-servant relationship as understood by common-law agency doctrine." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-23 (1992) (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739-740 (1989) (addressing rights under the Copyright Act of 1976 to a sculpture "prepared by an employee within the scope of his or her employment")). Following Reid, the Court in Nationwide adopted the "common-law test for determining who qualifies as an `employee' under ERISA." Id. at 323. And again recently, the Court agreed that "employee" under Title VII is defined by "traditional principles of agency law." Walters v. Metropolitan Educ. Enter. Inc., 117 S. Ct. 660, 666 (1997). Because Congress had overruled the Supreme Court's earlier interpretations of "employee" under both the National Labor Relations Act and the Social Security Act, in each of which the Court had defined employee "in light of the mischief to be corrected and the end to be obtained," see United States v. Silk, 331 U.S. 704, 713 (1947), the Court in Reid and Nationwide abandoned that approach, adopting the presumption that "Congress means an agency law definition for `employee' unless it clearly indicates otherwise." Nationwide, 503 U.S. at 325.

In order to establish a uniform nationwide application of the terms "employer," "employee," and "scope of employment" for purpose of applying federal statutes, Reid instructs that we rely on "the general common law of agency" and not the law of a particular state. Reid, 490 U.S. at 740-741 (emphasis added). And to determine the general common law of agency, the Court notes that it has traditionally looked to sources such as the Restatement of Agency. See id. at 752 n.31. Restatement (Second) of Agency § 220(2) provides a nonexhaustive list of factors for consideration when distinguishing employees from independent contractors. Focusing on these factors and also on others taken from various cases, the Court in Reid identified the following factors as relevant to the determination of whether the author of a sculpture was an "employee" or an independent contractor:

6

In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Reid, 490 U.S. at 751-752. The Court cautioned, however, that no one factor is determinative, and the consideration of factors must relate to the particular relationship under consideration. See id. at 752; see also Mangram v. General Motors Corp., 108 F.3d 61 (4th Cir. 1997) (applying common law factors in determining whether claimant under ADEA is employee); Robb v. United States, 80 F.3d 884 (4th Cir. 1996) (applying common law principles to determine federal question of whether physician was independent contractor for purposes of FTCA); cf. Garrett v. Phillips Mills, Inc., 721 F.2d 979 (4th Cir. 1983) (applying similar 12-factor test to determine whether claimant under ADEA is an employee); Haavistola v. Community Fire Co. of Rising Sun, 6 F.3d 211 (4th Cir. 1993) (applying Garrett factors in Title VII case).

At root, the distinction at common law between an employee and an independent contractor rests on the degree of control exercised by the hiring party. An employer controls the work and its instrumentalities and circumstances to a greater degree than does a hiring party in an independent contractor relationship. See Restatement (Second) of Agency §§ 2 & 220(2). But the degree of distinction between the two is related to the work itself and the industry in which it is performed. Thus, for example, the ultimate control of doctors performing work at hospitals results from a competition for control that is inherent in the duty of each to discharge properly its professional responsibility. A doctor must have direct control to make decisions for providing

7

medical care, but the hospital must assert a degree of conflicting control over every doctor's work -- whether an employee, an independent contractor, or a doctor merely with privileges-- to discharge its own professional responsibility to patients. See Robb, 80 F.3d at 888-91 (discussing role of control involving medical judgments). Consequently, it is less productive to debate the control over the discharge of professional services in the medical context than it might be in other service relationships. See Alexander v. Rush North Shore Medical Ctr., 101 F.3d 487 (7th Cir. 1996) (holding that an anesthesiologist who was required to be "on call" and whose patients were assigned to him by the hospital was nonetheless not an employee of the hospital for purposes of a Title VII action). More enlightening is the control involved in deciding when a doctor performs his services, the number of hours he performs them, and the administrative details incident to his professional services.

With this background in mind, we think it relevant to consider the following factors in determining whether a doctor, performing emergency room medical services at a hospital, is an employee or an independent contractor: (1) the control of when the doctor works, how many hours he works, and the administrative details incident to his work; (2) the source of instrumentalities of the doctor's work; (3) the duration of the relationship between the parties; (4) whether the hiring party has the right to assign additional work to the doctor or to preclude the doctor from working at other facilities or for competitors; (5) the method of payment; (6) the doctor's role in hiring and paying assistants; (7) whether the work is part of the regular business of the hiring party and how it is customarily discharged; (8) the provision of pension benefits and other employee benefits; (9) the tax treatment of the doctor's income; and (10) whether the parties believe they have created an employment relationship or an independent contractor relationship. See Reid, 490 U.S. at 751-52; Mangram, 108 F.3d at 62-63; Restatement (Second) Agency § 220(2).

With these principles now in hand, we proceed to consider the relationship between Cilecek and Emergency Physicians.

III

The facts defining the incidents of the contractual relationship between Cilecek and Emergency Physicians are not materially in dis-

8

pute. While their significance to whether an employment relationship or an independent contractor relationship was created is vigorously debated, resolution of that debate is a question of law. See, e.g., MacMullen v. South Carolina Elect. & Gas Co., 312 F.2d 662, 670 (4th Cir. 1963) (whether undisputed facts establish"statutory employee" status for purposes of workers compensation is question of law).

When we consider the factors most relevant to the relationship established between Cilecek and Emergency Physicians in this case, we conclude that the district court was correct in determining that Cilecek was an independent contractor. Most significantly: (1) The parties expressly set out from the beginning to create an independent contractor relationship, in distinction from the employment relationship that Emergency Physicians had with other doctors; (2) Cilecek proposed the number of hours he would work during any given month and the allocation of those hours to various shifts, and the hours that he worked were not uniform; (3) Cilecek had freedom to do other work, not only for himself but also for other health care facilities unrelated to Inova or Emergency Physicians; (4) Cilecek was paid only for work actually performed and not a uniform salary; (5) Except for professional liability insurance, Cilecek funded his own pension and other "employee benefits"; and (6) Both Cilecek and Emergency Physicians treated his taxes as if Cilecek were an independent contractor, in that Emergency Physicians did not withhold any taxes that were incident to an employment relationship. In summary, Cilecek exercised an independence from Emergency Physicians that enabled him to determine his hours, his income, and who he worked for. These are core incidents to a work relationship that are inconsistent with employee status.

While there are factors indicating otherwise, they are not as probative of the ultimate question of control. Cilecek focuses most heavily on (1) his obligation, when working for Emergency Physicians, to comply with detailed hospital regulations in carrying out his services at Inova hospitals; (2) his use of hospital-supplied instruments, and (3) the hospitals' ultimate control over the number of hours that he worked. Cilecek also argues that because Emergency Physicians paid him an "hourly wage" and unilaterally terminated their work relation-

9

ship and because his relationship with Emergency Physicians had been an enduring one, he was Emergency Physicians' employee.

It is true that Cilecek was required to abide by hospital rules and regulations for the treatment of patients, which regulated his work at the hospitals in substantial detail. As Cilecek has summarized those regulations:

> The rules and regulations governed every aspect of patient care, including: taking medical histories; conducting physical exams, tests and other procedures; patient progress notes; the manner of issuing patient medical orders; prerequisites and post-requisites to surgical procedures; ordering and administration of medications and medical devices; obtaining consultations and referrals; and making entries in medical records.

All of these regulations, however, relate to the professional standard for providing health care to patients for which both Emergency Physicians and the Inova hospitals had professional responsibility to their patients. While Cilecek certainly retained a professional independence in performing professional services, he also shared a professional responsibility to cooperate with the hospitals to maintain standards of patient care, to keep appropriate records, and to follow established procedures. This shared control exists both for employee doctors and for doctors merely enjoying practice privileges at a facility. If the hospitals did not insist on such details in the performance of professional services by doctors at their facilities, they would be exposing themselves to recognized professional liability. Because of the overarching demands of the medical profession, the tension in professional control between doctors and hospitals for medical services rendered at hospitals is not, we believe, a reliable indicator of whether the doctor is an employee or an independent contractor at the hospital.

Similarly, that Cilecek used instruments of the hospital emergency room that were supplied by the hospital is also inherent in the provision of emergency medical services and likewise is not a reliable indicator of employee status. Whether a doctor specializing in emergency medicine is an employee of the hospital or simply has privileges at

10

the hospital, he must, in almost every case, use emergency room facilities provided by the hospital in order to render his services.

And finally, while Emergency Physicians did ultimately determine the number of hours that Cilecek would work, that determination was made only after Cilecek proposed the number of hours he was willing to work. Moreover, the number of hours announced by the hospital in each case represented a coordination with the needs of the hospital in staffing the emergency room. We note that Cilecek did not, by choice, work the same number of hours each month and that he initiated his own adjustments to those hours. In at least two instances, he varied his hours in order to work at facilities not owned by Inova.

The additional factors argued by Cilecek do not advance his cause. Cilecek's pay was negotiated by the parties at an hourly rate to relate his pay to the time he worked. While employees are often paid "hourly wages," independent contractors are likewise often paid by the hour, e.g., plumbers. In this case, Cilecek's hourly rate enabled payment of fair compensation for fluctuating work and that fact is not indicative of whether Cilecek was an independent contractor or an employee. Also, that either party had a right to terminate the relationship is not indicative. The fact that Emergency Physicians, rather than Cilecek, in fact terminated the relationship does not indicate whether Cilecek was an employee or independent contractor. And finally, that the relationship was an enduring one might suggest the regularity inherent in an employment relationship. But, at various times in this relationship, Cilecek on his own initiative substantially curtailed his hours at Inova facilities in order to work at other hospitals, spending over a year in such an arrangement in the case of Mary Washington Hospital. His relationship with Emergency Physicians did not restrict his ability to make these adjustments nor did it prohibit him from working at unrelated facilities.

It is important to our conclusion in this case that the parties carefully designed their relationship to give Cilecek greater freedom than might otherwise be enjoyed by salaried employees of a hospital, and to that end they mutually agreed that they wanted to establish an independent contractor relationship. See Restatement (Second) Agency § 220(2)(i) ("In determining whether one acting for another is a servant or an independent contractor," the fact of "whether or not the

11

parties believe they are creating the relation of master and servant" is considered); Robb, 80 F.3d at 893 ("we can not ignore the clear expression of intent . . . to establish an independent contractor relationship"). Moreover, the mutual intent to create an independent contractor relationship was confirmed uniformly by the parties in the way they treated benefits and taxes and in the way they represented their relationship to third parties.

Considering all the relevant factors, we conclude that Cilecek was an independent contractor and that, therefore, he is not entitled to sue either Emergency Physicians or Inova under Title VII of the Civil Rights Act of 1964 based on their termination of the relationship.

AFFIRMED

MURNAGHAN, Circuit Judge, dissenting:

It is a difficult line to draw between (1) facts which are disputed and (2) a set of facts outlining what is crystal clear. Here, in granting summary judgment in the hospital's favor and thereby foreclosing any resolution by the factfinder of the issue: employee or independent contractor, the majority has crossed that difficult line and gathered up for itself resolution of a disputed fact question. The majority relies on the evidence, which is no doubt strong, in the hospital's favor but gives no weight to facts favoring Cilecek which are of sufficient substance to make the issue a disputed one.

I.

During his association with the Inova facilities, Dr. Cilecek considered himself a house physician on staff, not merely a doctor with privileges at the two facilities. The Fairfax Hospital Medical Staff Bylaws and Rules and Regulations require that "[t]he acts performed by the House Physician shall be at the direction and under the supervision of the chairman of the clinical department to which the individual has been assigned." Dr. Cilecek's department chairman was Dr. Thom Mayer. Defendant Joan Miles served as administrator of ACCESS. Both Mayer and Miles had the power to enforce Dr. Cilecek's compliance by initiating corrective action against him, including additional

12

supervision, suspension, and termination. After the entry of Emergency Physicians of Northern Virginia (EPNV), Dr. Cilecek continued to work at the Inova hospitals under the same terms and conditions, except that his paycheck and insurance were provided by EPNV, instead of Inova.

In August 1991, Dr. Cilecek went to work for another medical group located in North Stafford, Virginia. In the fall of 1992, however, EPNV offered Dr. Cilecek more money to work full-time at the Fairfax Hospital and ACCESS. Dr. Cilecek accepted Dr. Mayer's offer in a letter agreement in which Dr. Cilecek requested that he be deemed an independent contractor, and Dr. Mayer agreed. Such an agreement of the parties cannot overcome the actual facts. Under that agreement, Dr. Cilecek actually worked an average of 130-140 hours per month. EPNV paid Dr. Cilecek $90.00/hour and also supplied his medical malpractice insurance.

II.

The common law standard focuses on the degree of the employer's control over the individual. Haavistola v. Community Fire Co. of Rising Sun, Inc., 6 F.3d 211, 219-220 (4th Cir. 1993). The "economic realities" test examines the extent to which the individuals "who as a matter of economic reality are dependent upon the business to which they render service." Bartels v. Birmingham , 332 U.S. 126, 130 (1947).

The Fourth Circuit follows the hybrid approach, which combines elements of both the common law and "economic realities" tests. See Haavistola, 6 F.3d at 220; Garrett v. Phillips Mills, Inc., 721 F.2d 979, 981 (4th Cir. 1983). Under the hybrid approach, the court's inquiry must focus on the following factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether

13

by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

Haavistola, 6 F.3d at 222 n.4 (citing Garrett, 721 F.2d at 982).

A majority of those factors points to Dr. Cilecik as an employee. Dr. Cilecek argues that his supervision, setting of his schedule, and how his duties differed from other doctors were all in genuine dispute. Dr. Cilecek, and the amicus (the Equal Employment Opportunities Commission) point out that Dr. Cilecek presented evidence that he was considered a "house physician" under Inova's Bylaws. Those Bylaws stated that house physicians work under the"direction and supervision" of either (1) the director of their clinical department; or (2) staff physicians for whom work is done. Under either prong, Dr. Cilecek states that person was Dr. Mayer, who was both the Director of the Department of Emergency Medicine for Fairfax Hospital and the staff physician for whom Dr. Cilecek worked.

Moreover, Dr. Cilecek presented evidence that he was required to work under the supervision of Dr. Mayer, and that Dr. Mayer's supervision of him was pervasive. In his affidavit attached to his opposition to Inova's summary judgment motion, Dr. Cilecek contends that Inova controlled the way Dr. Cilecek performed his work, including how he took medical histories, conducted physical exams, tests and other procedures, made patient progress notes, issued patient medical orders, handled surgical procedures, ordered and administered medications and medical devices, obtained consultations and referrals, and made entries in medical records. Dr. Cilecek also states that Miles, Inova's administrator, controlled how he performed his work, such as when to conduct patient physical examinations, and how to handle prescription pads.

In addition, Dr. Cilecek argues that he presented evidence that Inova and EPNV set and unilaterally changed his hours, as well as evidence showing that his duties were the same as the other doctors

14

at the hospital. Dr. Cilecek states that he was required to submit a requested schedule, and his schedule would either be approved as submitted or altered, thus he was not free to set his own hours. Furthermore, Dr. Cilecek stated in his affidavit that if he wanted to work fewer hours in a month he obtained the approval of his superior, Dr. Mayer.

With respect to the same duties issue, Dr. Cilecek contends that the record shows that Dr. Cilecek was required to submit his requested schedule for work, the same as other emergency physicians, Inova's Bylaws required every "house physician" to perform the same duties, observe the same rules and procedures, operate under the same supervision, meet the same performance standards, and answer to the same disciplinary procedure. Finally, Inova and EPNV provided the workplace and equipment.

Here, disputes abound over the issues of Dr. Cilecek's supervision by Mayer and the manner in which Dr. Cilecek's work schedule was set, for example, whether Dr. Cilecek could himself provide his own schedule, or whether Mayer could alter the schedule. The choice of the term "independent contractor" by Cilecek to describe himself, while the factfinder might pay it attention, was by no means controlling. Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318 (1992).

In the instant case, the district court granted summary judgment in favor of EPNV and Inova pre-discovery, that is before these disputed issues could even be explored. The majority opinion usurps the role of the factfinder and resolves disputed factual issues in EPNV and Inova's favor. It appears to me that relevant facts were in dispute, making summary judgment inappropriate and ill-advised. Consequently, I dissent.

15