Carol L. BENDER, M.D.,
Plaintiff–Appellant,

v.

SUBURBAN HOSPITAL,
INCORPORATED, Defendant–Appellee,

and

Board of Trustees of Suburban Hospital, Incorporated; John W. Barrett; Richard Byrne, M.D.; John Eng, M.D.; Don Fontana, M.D.; Antoni Goral, M.D.; Brian Grissler; Jay Grodin, M.D.; Wendell Holloway; Patricia Kellogg, M.D.; Harris Kenner, M.D.; Lawrence Kline; Sydney Malawer, M.D.; Ira Miller, M.D.; William Minogue, M.D.; Richard Pollen, M.D.; Robert Rothstein, M.D.; John Saia, M.D.; Joel Schulman, M.D.; Robert Snider; Michael Stanton, M.D.; Roger Titus; Alan Wolland, M.D., Defendants.

No. 98–1637.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 22, 1998.

Decided Oct. 30, 1998.

**ARGUED:** Diane Elizabeth Bieri, Howrey & Simon, Washington, D.C., for Appellant. Jonathan Barkasy Sprague, Post & Schell, P.C., Philadelphia, Pennsylvania, for Appellee. **ON BRIEF:** Margaret M. Swisler, Lisa J. Saks, Laura S. Shores, Howrey & Simon, Washington, D.C., for Appellant. S. Allan Adelman, Godard, West & Adelman, P.C., Rockville, Maryland, for Appellee.

Before NIEMEYER, HAMILTON, and LUTTIG, Circuit Judges.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge NIEMEYER and Judge HAMILTON joined.

## OPINION

LUTTIG, Circuit Judge:

Dr. Carol Bender appeals the dismissal, for failure to state a claim, of her Title VII discrimination suit against Suburban Hospital for its refusal to renew her staff privileges. We affirm.

## I.

According to her complaint, Bender is a doctor of internal medicine and has maintained a private practice in Rockville, Maryland, since 1977. Also in 1977, Bender acquired staff privileges at Suburban Hospital ("Suburban" or "the hospital") in nearby Bethesda, Maryland. At some point, she acquired like privileges, which she still holds, at Shady Grove Adventist Hospital in Gaithersburg.

Staff privileges at a hospital facilitate a physician's practice. Such privileges enable a physician to admit and treat patients, order medication and procedures, receive various services from hospital staff, and use hospital equipment and office space. At Suburban, Bender and other physicians with staff privileges created a coverage group agreement pursuant to which they covered for each other when a member of the group was unavailable. Suburban facilitated the increase in a physician's patient base by offering a physician-referral program and an "on-call" roster for emergency room duty. Staff privileges do entail various duties for a physician, such as ensuring one's licensing and continuing education, paying dues, and serving on committees. Privileges at Suburban extend for two years, after which the Board of Trustees of Suburban may renew them for another two-year term.

Bender's relationship with Suburban began to sour in the fall of 1992. As part of her renewal application, and in light of some alleged behavioral incidents, Suburban required Bender to undergo a psychiatric evaluation, which she did in February 1993. In May 1993, a committee recommended that Suburban condition Bender's reappointment on her submitting to counseling and therapy. This recommendation led both to further hearings at the hospital and to Bender filing complaints with the federal Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission on Human Relations. In February 1996, after further wrangling and failed negotiations, Suburban terminated Bender's staff privileges, prompting a second complaint with the EEOC, alleging retaliation, which resulted in the EEOC issuing a right-to-sue letter in April 1997.

Suburban, pursuant to its legal obligation, duly reported its termination of Bender's privileges to the National Practitioners' Data

Bank, a clearinghouse of information on health care providers. Whenever a physician applies for staff membership or privileges with a health care entity, the entity must acquire a report on her from the Data Bank. Likewise, preferred provider organizations ("PPO") may access information regarding a physician who wishes to contract with them. Suburban informed the Data Bank that it had terminated Bender's privileges after nineteen years "because of her long history of disruptive and abusive conduct in the Hospital and her refusal to obtain professional counseling," and because of "unprofessional conduct." It submitted a similar report to the Maryland Board of Physician Quality Assurance.

In April 1997, Bender sued the Hospital, its Board, and various doctors at Suburban. Her 38 page, 129 paragraph complaint alleged violation of numerous Maryland laws, as well as of Title VII of the federal Civil Rights Act of 1964. The Title VII theory involved two claims: first, a "direct" claim that Suburban had discriminated against her in employment by refusing to renew her staff privileges on account of her sex; second, an "indirect" claim that Suburban's actions had harmed her ability to secure employment elsewhere. The district court dismissed both federal claims for failure to state a claim, and dismissed the state claims without prejudice. Bender appeals the dismissal of her second Title VII claim.

## II.

Various strategic decisions of both sides to this case have narrowed the issue on appeal to one: whether Bender's complaint for "indirect" discrimination sufficiently alleges that Suburban harmed some employment relationship of Bender with a third party. For the reasons that follow, we hold that it does not.

1. The Seventh Circuit, although initially following *Sibley* completely in *Doe v. St. Joseph's Hospital of Fort Wayne*, 788 F.2d 411 (7th Cir.1986), has since suggested that, if given a chance to reconsider, it would narrow the scope of *Sibley* liability, at least by requiring the plaintiff to demonstrate both a "de facto" or "indirect" employment relationship with the defendant and a

We need not consider whether Bender's relationship with Suburban suffices for a direct claim against the hospital for discrimination. The district court held that such a claim requires an employment relationship and that a doctor with staff privileges at a hospital is an independent contractor, not an employee. Bender waives any challenge to this holding by not appealing it.

We also need not resolve for the first time in this Circuit whether Title VII allows indirect liability for an employer's interference with an individual's employment with third parties. Every Court of Appeals to consider this issue has followed the lead of the District of Columbia Circuit in allowing such a claim, *see, e.g., Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338, 1341–42 (D.C.Cir. 1973); *Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870, 875 (6th Cir.1991).[1] Suburban does not contest the *Sibley* line of cases; it argues instead merely that Bender does not fit within that line because she has failed to plead a "third party employment relationship." Appellee's Br. at 5. And we reach the same result by applying *Sibley* as we would if we were to reject it. Suburban also does not argue that Bender's relationship with the hospital was too tenuous to bring this case within *Sibley*, which requires that a plaintiff's relationship with the defendant be at least one where the defendant "controlled the plaintiff's employment relationship" with third parties and was the plaintiff's "de facto or indirect employer." *See EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir.1995). Thus, we assume, without deciding, that the general rule of *Sibley* applies here—that an entity who is an "employer" under Title VII may be liable for interfering with someone's employment relationship with a third party, if done for discriminatory reasons, and that Suburban's relationship with Bender sufficed to make such liability possible.

common-law employment relationship with which the defendant interfered. *See EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir.1995); *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487, 491–92, 493 n. 2 (7th Cir.1996) (overruling *Doe* in part), *cert. denied*, — U.S. —, 118 S.Ct. 54, 139 L.Ed.2d 19 (1997).

■ But that does not mean we follow *Sibley* and like cases as to what satisfies the requirement that plaintiff show an "employment relationship" with a third party. Although *Sibley* itself repeatedly referred to its interpretation of Title VII as applying to interference with *"direct employment relationships* between third parties," *see, e.g.,* 488 F.2d at 1342 (emphasis added), the court there, without discussion or explanation, treated a private nurse's relationship with patients at a hospital as satisfying the rule. Faced with this apparent tension between *Sibley*'s articulated standard and its application of that standard, we follow the standard articulated and require a plaintiff to allege harm to an employer-employee relationship, as defined by the law of agency. We believe that the language of Title VII, along with precedent of the Supreme Court and this Circuit, compels such a rule. Further, any other rule would extend Title VII's reach to any and every relationship that an employer's discrimination might harm in any way, a result we are reluctant to conclude Congress intended.

Title VII provides in relevant part as follows:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.

42 U.S.C. § 2000e–2(a). Because Bender's claim on appeal does not rest on Suburban's alleged failure or refusal to "hire" her, or its "discharge" of her, but rather on the *consequence* of such "discharge," her claim must find a home in the third clause if it is to state a claim: she must allege that Suburban discriminated against her "with respect to [her] compensation, terms, conditions, or privileges of employment."

The operative term for purposes here is "employment." That is, the clause presumes the existence of an employer-employee relationship, as defined by longstanding principles of agency law,[2] in contrast to, for example, an independent contracting relationship. *See Diggs v. Harris Hospital–Methodist, Inc.,* 847 F.2d 270, 274 (5th Cir.1988) ("[E]ven if we were to hold that Harris Hospital could violate the provisions of Title VII by interfering with Diggs's relationship with a third party—a question we do not reach— that relationship would have to be an employment relationship under the economic realities/common law contract control test."); *Mitchell v. Frank R. Howard Memorial Hosp.,* 853 F.2d 762, 767 (9th Cir.1988) (explaining that even under *Sibley,* "there must be some connection with an employment relationship for Title VII protections to apply") (citation omitted).

The Supreme Court has stated that "Congress means an agency law definition of 'employee' unless it clearly indicates otherwise." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 325, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). *See id.* at 324–25, 112 S.Ct. 1344 (noting that when the Court rejected the agency-law test in interpreting the National Labor Relations Act and the Social Security Act, Congress both times amended the law to reinstate it); *Frankel v. Bally, Inc.,* 987 F.2d 86, 90 (2d Cir.1993) (holding that "in the context of anti-discrimination legislation . . . *Darden* mandates the application of the common law agency test"). The Court has recently applied this rule to Title VII, agreeing that whether an employment relationship ex-

---

**2.** Additionally, and alternatively, we note that this Court and the First Circuit have both, subsequent to the Supreme Court's broad reading of § 2000e–3(a) in *Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), reiterated that "individual" in § 2000e–2(a) only applies in the context of an employment relationship. *See Serapion v. Martinez,* 119 F.3d 982, 985 (1st Cir.1997) ("Although the language we have quoted [§ 2000e–2(a)(1)] speaks of 'any individual,' courts long ago concluded that Title VII is directed at, and only protects, employees and potential employees."), *cert. denied,* —— U.S. ——, 118 S.Ct. 690, 139 L.Ed.2d 636 (1998); *Mangram v. General Motors Corp.,* 108 F.3d 61, 62 (4th Cir.1997) (similarly interpreting identical language of Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1)). We think this consistent with the Supreme Court's brief discussion of "individual" in *Robinson,* in which the Court seemed to view the word, as used in § 2000e–2(a), as applying to former, current, and potential employees. *See* 519 U.S. at ——, 117 S.Ct. at 848.

ists turns on "traditional principles of agency law," and citing *Darden. Walters v. Metropolitan Educational Enterprises Inc.,* 519 U.S. 202, ——, 117 S.Ct. 660, 666, 136 L.Ed.2d 644 (1997). *See Cilecek v. Inova Health System Services,* 115 F.3d 256, 260 (4th Cir.1997) (relying on *Darden* and *Walters* to apply common law agency test to Title VII), *cert. denied,* —— U.S. ——, 118 S.Ct. 694, 139 L.Ed.2d 639 (1998). The relevant law for defining an employment relationship is not that of any particular state, but rather the "general common law of agency." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 740–41, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).

■ Although various factors are considered in determining whether an employment relationship exists, the critical question is "the degree of control exercised by the hiring party" over "the work and its instrumentalities and circumstances." *Cilecek,* 115 F.3d at 260. In the context of alleged employment in the health care field, the following factors have proven most relevant: (1) the control of when and how long the doctor works; (2) the source of instrumentalities of the doctor's work; (3) the duration of the parties' relationship; (4) whether the hiring party has the right to assign additional work to the doctor or to preclude the doctor from working at other facilities or for competitors; (5) the method of payment; (6) who controls the doctor's assistants; (7) whether the work is part of the regular business of the hiring party and how it is customarily discharged; (8) the provision of pension benefits and other employee benefits; (9) the tax treatment of the doctor's income; and (10) the parties' understandings as to whether an employment relationship exists. *Id.* at 261.

Under the above factors, Bender's complaint does not allege any employment relationship with third parties. By her own words, none of the three relationships that she alleges she has lost—with patients, PPOs, and hospitals—rises to the level of an employer-employee relationship.

■ First, Bender's relationship with her patients cannot possibly amount to an employer-employee relationship. As the district court explained, "[i]t cannot be questioned that the typical doctor-patient relationship clearly lacks the elements of control or the economic factors necessary to define an employment relationship." J.A. at 73. A patient is a doctor's customer, not his employer. *See Alexander,* 101 F.3d at 493 n. 2 ("Dr. Alexander is ... also not an employee of his patients, just as an insurance agent or a limousine driver is not an employee of her customers."); *Diggs,* 847 F.2d at 274 ("Diggs's relationship with her patients is decidedly not one of employment. Her patients did not control the manner and means of her professional treatment."). Of course, it is not impossible that Bender's relationship with her patients could differ from the customary doctor-patient relationship. Nothing in her complaint, however, indicates that it does or even hints that it does. On the contrary, the complaint refers to her lost opportunity to "build her private medical practice," presumably by acquiring patients in the normal manner. Her repeated conclusory references to "employment opportunities with patients" make claims of law, not fact, and the alleged facts belie those claims. What was said of the plaintiff-doctor by the Ninth Circuit in *Mitchell* is equally true of Bender:

> Dr. Mitchell has not alleged any facts which would support a finding that his relationships with his patients or prospective patients are employment relationships for the purposes of Title VII.... Because Dr. Mitchell has not averred that his relationships with his patients in any way diverge from the traditional physician/patient relationship, we hold that as a matter of law his allegations that the Hospital interfered with his relationships with his patients fail to state a claim for relief under Title VII.

853 F.2d at 767.

■ Second, Bender has not alleged lost employment opportunities with PPOs. Instead, her pleadings leave no doubt that she herself views such relationships, or at least the ones she reasonably expects to make, for what they are—independent contracting arrangements. Her complaint does not even use the word "employment" regarding such a relationship, instead lamenting her inability

"to obtain *membership* in" a PPO, J.A. at 35, or "to *enroll* [ ] in" a PPO, J.A. at 36, or "to *contract with* " a PPO, J.A. at 32 (emphases added). As the complaint itself explains, the benefit to a doctor of joining a PPO is not in employment but in being on the "preferred provider lists that guide patients" to doctors. J.A. at 36–37.

■ Third, Bender's claim that Suburban has impaired her "ability to obtain staff privileges at other hospital[s]," J.A. at 35, also fails to state an employment relationship. The district court's unappealed holding that her staff privileges at Suburban did not make her an employee of Suburban compels the same conclusion as to like privileges with any other hospital, which is all that Bender has pleaded. *See* J.A. at 36 (alleging that Suburban's actions forced her "to refrain from applying for medical staff privileges at any other hospital"); *id.* at 37 (alleging that Bender "is foreclosed from seeking staff privileges at many hospitals," and that "she will lose her staff privileges at Shady Grove . . . ."). *See also Alexander,* 101 F.3d at 488–89 (applying common law agency test and holding that "a self-employed physician with staff privileges at a hospital," is not that hospital's employee, even where as a condition for privileges he must spend time "on call" to the hospital's emergency room); *cf. Cilecek,* 115 F.3d at 257 (applying common law agency test and holding that "a physician under contract to provide emergency medical services at two hospitals" was not either hospital's employee). *Cilecek* even suggested that staff privileges and similar arrangements occupy a third category of control *below* that of independent contractor. *See* 115 F.3d at 260 (referring to "an employee, an independent contractor, or a doctor merely with privileges").[3]

Bender argues that the district court erred by faulting her for not even applying for other positions, whether with hospitals or PPOs. To state a claim under § 2000e–2(a), she argues, a plaintiff need not allege *actual* lost employment opportunities, just potential losses, particularly in her case, where application for other positions would lead to a search of the Data Bank, further disseminating Suburban's allegedly false adverse action report and thus increasing the damage to Bender's reputation and prospects.

■ But even if we were to accept Bender's argument, that would not lead us to the position she urges, by which a plaintiff may state a claim simply by incanting the words "employment opportunities" in her complaint. The complaint must at least point to potential employment relationships with actual parties ·to whom the plaintiff would have applied but for the defendant's actions. It must be grounded in the realities and particulars of the plaintiff's life. Even in *Sibley,* the nurse pointed to lost "employment" possibilities with actual patients at a particular hospital.

The case on which Bender relies most heavily, *Morrison v. American Board of Psychiatry and Neurology, Inc.,* 908 F.Supp. 582 (N.D.Ill.1996), cannot support her in this regard. Apart from the fact that this district court case is not even from this Circuit, the opinion ignored whether the plaintiff had pleaded lost *employment* relationships, because the defendant did not raise such an argument. *Id.* at 586. In addition, Morrison's claim of lost third-party employment opportunities was not as vague and conclusory as Bender's because Morrison was, at the time of her suit, actually "*employed* by two medical facilities," *id.* at 583 (emphasis add-

---

3. To the extent that we might construe Bender's Count II, for "Retaliation in Violation of Title VII," as arising under § 2000e–3(a)'s ban on retaliatory discrimination rather than under § 2000e–2(a)—even though her briefs do not cite § 2000e–3(a); she did not mention it at oral argument; and Count II parrots the language of § 2000e–2(a), by claiming that Suburban's termination of her privileges "was with respect to the terms, conditions and privileges of her employment"—the result would be the same. For her complaint to state a claim under § 2000e–3(a), Bender would have to be Suburban's "employ-ee[ ]," "applicant[ ] for employment," 42 U.S.C. § 2000e–3(a), or, after *Robinson v. Shell Oil,* former employee—the question still turns on the agency-law definition of "employee." *See Hartsell v. Duplex Prods. Inc.,* 123 F.3d 766, 775 (4th Cir.1997) (stating that a jury instruction that a retaliatory discharge suit requires "some adverse employment action" does "not even implicate *Robinson* "). If there were any doubt as to whether Bender's staff privileges made her Suburban's employee—and we do not think there is—the district court's unappealed ruling that they did not resolves it.

ed), and she alleged that the Board's discriminatory testing harmed her ability to secure similar employment elsewhere. Most importantly, both the court and the parties in *Morrison* were bound by Seventh Circuit precedent that did not treat the common law of agency as governing the existence of an employment relationship for purposes of Title VII, a view that the Seventh Circuit has since repudiated, *see Doe v. St. Joseph's Hospital of Fort Wayne*, 788 F.2d 411 (7th Cir. 1986), *overruled by Alexander*, 101 F.3d at 491–92, and that the precedent discussed above requires us to reject.

■ Bender's final argument is that we reverse the district court because notice pleading requires generosity in interpreting a plaintiff's complaint. But generosity is not fantasy. We must read the complaint as plaintiff writes it, and Bender's complaint does not allege any employment relationship that she has or might have had. The district court succinctly explained Bender's misunderstanding in this regard:

> Although the complaint labels the relationship between Dr. Bender and third parties as "employment relationships," .... [t]he factual allegations make it obvious that when Dr. Bender uses this term she states a legal conclusion that inaccurately characterizes the referenced relationships.... [T]he court is not required to accept such a conclusion as true for the purposes of [a 12(b)(6)] motion.

J.A. at 75. Given that Bender is, and long has been, self-employed in private practice, her inability to plead such a relationship is likely a product of honesty (and Rule 11), not oversight. Further, while notice pleading does not demand that a complaint expound the facts, a plaintiff who does so is bound by such exposition. *See Jefferson v. Ambroz*, 90 F.3d 1291, 1296 (7th Cir.1996) (explaining that although notice pleading does not require a plaintiff to plead particulars, "if a plaintiff chooses to [do so], and they show that he has no claim, then he is out of luck"). Bender's voluminous complaint repeatedly

demonstrates that Suburban, if it has wrongfully harmed her relationships with third parties at all, has harmed not employment relationships, but rather relationships that supplement her private practice. Faced with such a complaint, the district court did not err in dismissing it for failure to state a claim.[4] Accordingly, the judgment of the district court is affirmed.

*AFFIRMED.*

---

4. This is not to suggest that Bender would have survived the 12(b)(6) motion had she filed a one paragraph complaint merely alleging harm to unspecified "employment relationships." As discussed above, such a conclusory claim cannot suffice under any sensible reading of notice pleading and the scope of the *Sibley* rule.